# IN THE SUPREME COURT OF IOWA

No. 15–1256

Filed March 4, 2016

**IN THE INTEREST OF M.W. AND Z.W.,**
    Minor Children,

**R.W.,** Mother,
    Appellant.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Woodbury County, Julie A. Schumacher, Judge.

The juvenile court terminated a mother's parental rights to her two children. The State appeals a court of appeals decision affirming the juvenile court's termination of parental rights for one child and reversing the termination of parental rights for the other child. **DECISION OF COURT OF APPEALS AFFIRMED IN PART AND REVERSED IN PART; JUVENILE COURT JUDGMENT AFFIRMED.**

David A. Dawson, Sioux City (until withdrawal), then Theresa Rachel of Deck Law, L.L.P., Sioux City, for appellant.

Thomas J. Miller, Attorney General, Kathrine S. Miller-Todd, Assistant Attorney General, Patrick A. Jennings, County Attorney, and Dewey P. Sloan, Assistant County Attorney, for appellee.

**ZAGER, Justice**.

The juvenile court terminated a mother's parental rights to two of her children. The court of appeals affirmed the termination of parental rights to one of the children and reversed as to the other. The State appeals and requests that we affirm the juvenile court's termination of parental rights for both children. After our de novo review of the record, we conclude that the juvenile court order terminating parental rights to M.W. under Iowa Code section 232.116(1)(*h*) (2013) was proper. We therefore affirm the decision of the court of appeals to the extent it confirmed the termination of parental rights to M.W. However, we reverse the decision of the court of appeals as to Z.W. and conclude that termination of parental rights to Z.W. under Iowa Code section 232.116(1)(*h*) was also proper and supported by clear and convincing evidence in the record. We affirm the court of appeals on all other grounds.

## I. Background Facts and Proceedings.

R.W. is the mother and M.D.W. is the father of M.W. and Z.W. (the children). Both parents' parental rights to the children were terminated in July 2015.[1] M.W. was born in April 2013 and Z.W. was born in March 2012, making them two years old and three years old at the time of the termination hearing.

The family came to the attention of Child Protective Services (CPS) on or around April 29, 2014, after the children's younger sibling L.W. died while under the supervision of their father.[2] M.D.W. reported that

---

[1]The parental rights of M.D.W. to M.W. and Z.W. were terminated at the same time as those of R.W., but M.D.W. did not appeal the termination order. Thus, we only address the termination of parental rights as to R.W.

[2]M.D.W. was charged with three counts of neglect of a dependent person in violation of Iowa Code section 726.3, one count of child endangerment resulting in death of a child in violation of Iowa Code section 726.6(4), and one count of child

he awoke at noon to find L.W. unresponsive. M.D.W. arrived at Unity Point Hospital in Sioux City with L.W. at approximately 2:20 p.m. He reported that the reason he did not call an ambulance for L.W. was that there was an active arrest warrant for him in Woodbury County. By the time M.D.W. arrived at the hospital with L.W., full rigor mortis had set in. Hospital personnel estimated that the time of death was four hours prior to arriving at the hospital. When L.W. arrived at the hospital, he was wearing filthy clothes that reeked of urine and feces, was unbathed, and had a number of sores around his neck. As described by the juvenile court, the autopsy report noted that L.W.

> had a wizened appearance with skin tenting and sunken eyes, . . . [and] failure to thrive with all growth parameters below the fifth percentile. The report further noted contusions and abrasions on the 2-month-old infant's hands, further noting the post-mortem chemistry was consistent with severe dehydration. The report indicated the cause of death as malnutrition and dehydration due to neglect, with [the] manner of death being homicide.

Although L.W. was approximately two months old at the time of his death, R.W. reported that he may have only received three baths in his life because she was often too tired after returning home from work to bathe him. She also reported only giving L.W. bottles of sugar water on numerous occasions.

On the same day L.W. was brought to the hospital, law enforcement and CPS officers executed a removal order and removed the children from the home. The children were placed in foster care with nonrelatives. The same day that the children were removed from their

---

endangerment resulting in the bodily injury of a child in violation of Iowa Code section 726.6(6). R.W. was charged with one count of child endangerment resulting in the death of a child in violation of Iowa Code section 726.6(4), and three counts of neglect of a dependent person in violation of Iowa Code section 726.3. Her trial was still pending at the time of the termination hearing.

parents' care, law enforcement and CPS officers went to the apartment where R.W., M.D.W., and the children had been residing. The investigators described the conditions of the home as deplorable. On May 1, Dr. Jung visited the apartment with law enforcement officers. He reported,

> I inspected all rooms of the residence. I inspected the bedroom where the parents slept. I inspected the children's bedding in their bedroom. I inspected the bathroom which was very foul smelling with hundreds of flies and gnats surrounding a substantial pile of very old and putrid smelling soiled diapers.

> The children's bedding was caked with soiling and matted dirt, debris, and body fluid. There was a very strong stench coming from the children's bedroom. Scatter[ed] throughout the floor on the carpet of the entire apartment were discarded used food containers and garbage which made it difficult to walk through. The carpet was stained and smelled of rotting feces and decaying vegetables and food products. All surfaces, including chairs, floors, and bedding were in an extremely filthy, putrid, and unhealthy state. The stench was sickening and clearly was not safe to inhabit by anyone.

> It would be my medical opinion that this apartment was not in a safe living condition for anyone, but particularly small dependent children who would be at serious medical and health risk by living in this squalor, filth and fly/gnat infested environment. The conditions of this home are beyond what one could appreciate with a photograph. The stench, the flies, the gnats, carpet, bedding, the trash, the rotting dirty diapers from months previous created a garbage dump odor and appearance. The conditions of this apartment as stated previous[ly are] not safe for children to be residing in to maintain a minimum level of health and safety.

Additionally, the landlord had sent R.W. a number of letters about the condition of her apartment. The landlord inspected the apartment in January and February 2014 and observed a strong odor, garbage around the apartment, soiled carpet, and dirty dishes everywhere. He gave R.W. time to clean the apartment and scheduled a re-inspection in March.

R.W. refused the landlord's employee entry to the apartment when it came time for the re-inspection. Following Dr. Jung's inspection on May 1, R.W. cleaned her apartment. The landlord reported that R.W. had cleaned the apartment and obtained new furniture as of May 13.

Following their removal, hair stat tests were performed on the children. M.W. tested positive for cannabinoids and carboxy-THC. Z.W. tested positive for cannabinoids, carboxy-THC, and native THC. A test was also performed on the deceased L.W., who tested positive for amphetamines, methamphetamine, cannabinoids, carboxy-THC, and native THC. R.W. initially admitted that both she and M.D.W. had substance abuse problems. She stated that she only used marijuana and denied the use of any amphetamines. However, she did acknowledge that she was uncertain what drugs she had ingested on a number of occasions because "[M.D.W.] would load the pipes and she would not necessarily know what was being loaded in the pipe." She also admitted that she had given M.D.W. money in the past to buy marijuana to calm his nerves and to buy Adderall so he would be able to stay awake while watching the children. M.D.W. was on probation at the time of the children's removal, and his probation officer collected a urine sample. This urinalysis tested positive for THC. M.D.W. admitted to using Adderall and signed an admission that the last time he used marijuana was on or around April 26. M.D.W. also has a history of domestic abuse assaults. R.W. was the victim of at least two domestic assaults by M.D.W. On at least one occasion, all three children were present in the apartment when M.D.W. assaulted R.W.

M.D.W. was the primary caretaker of the three children while R.W. was at work. However, R.W. acknowledged that she knew M.D.W. was not providing an adequate level of care for the children while she was at

work, and she did nothing to remedy the situation. R.W. told CPS that M.D.W. would stay up all night playing video games and sleep during the day instead of taking care of the three children. She said that she knew the children were not being fed properly, were not being bathed, and were being neglected by M.D.W. CPS noted in its investigative report that "[R.W.] was fully aware of the type of care [the children] were receiving from [M.D.W.] and she did nothing to protect her children."

A temporary removal hearing was held on May 8 for M.W. and Z.W. After the hearing, custody of the children remained with the Department of Human Services (DHS) for placement in foster care, subject to visitation at DHS discretion. The juvenile court found that it would be contrary to the welfare of the children for them to be in the custody of their parents. On May 28, CPS finished its investigation into the conditions giving rise to the children's removal. The report confirmed the allegations as to M.W., Z.W., and L.W. for: (1) the denial of critical care for failure to provide adequate shelter, adequate supervision, or adequate health care; and (2) the presence of illegal drugs in the body of a child.

R.W. obtained a substance abuse evaluation. The substance abuse evaluation recommended that she enroll in residential-level care, followed by a half-way house or intensive outpatient treatment. R.W. did not follow this recommendation and instead chose to participate in intensive outpatient treatment. She began treatment on May 13, and the record reveals that her participation remained consistent. Her therapist rated her at a moderate risk for relapse and recommended that she remain in the intensive outpatient program. R.W. also underwent a psychiatric evaluation on May 28. She was diagnosed with Major Depressive Disorder, Generalized Anxiety Disorder, Posttraumatic Stress Disorder (PTSD), and Dependent Personality Disorder. She was

prescribed medications to help with her nightmares and PTSD symptoms, and her evaluator recommended that she attend therapy on a regular basis.

On May 29, the juvenile court held a combined temporary removal and adjudication hearing. In an order filed June 2, the court noted that R.W. had stipulated to the statutory grounds for adjudication but not the factual grounds. The court found that there was clear and convincing evidence that M.W. and Z.W. were children in need of assistance (CINA) pursuant to the statutory grounds as alleged in the petition filed by the State on May 1 and the amended petition filed by the State on May 2. The grounds alleged in the State's amended petition included Iowa Code sections 232.2(6)(*b*), .2(6)(*c*)(2) and .2(6)(*n*). The juvenile court noted that all parties were in agreement with the pre-dispositional recommendations. Neither parent appealed the CINA adjudication order.

On the same day that the children were adjudicated CINA, the juvenile court denied R.W.'s request to place the children in the care of their maternal aunt and her spouse. The juvenile court noted as a potential concern the fact that the aunt had visited the apartment sixteen days before L.W.'s death and reported that she believed the apartment was clean and that she saw nothing wrong with L.W. The aunt and her spouse did eventually complete foster care classes and were licensed as foster parents. They took physical custody of M.W. and Z.W. in February 2015.

After the CINA adjudication, R.W. underwent another psychological evaluation with Dr. Michael Baker. R.W. reported no history of therapy but indicated she took Lexapro in the past for approximately one month due to feeling overwhelmed taking care of three young children. She reported having suicidal thoughts in the past and cutting herself to gain

attention. Both of these statements are contrary to what she told her original evaluator. Dr. Baker summarized his evaluation of R.W., stating,

> [R.W.] generally reports a non-traumatic childhood background, a fairly responsible work history, an intellectual and educational level of at least average, and yet remained in this very co-dependent, abusive arrangement with obvious lack of care for her children . . . . While feeling overwhelmed by the situation of childcare, employment, and the dysfunction of a substance abusing, non-responsible acting father to her children, she did not approach any constructive options for change, but continued to return to the same dysfunctional, unhealthy and disastrous situation for herself and her children.
>
> . . . .
>
> [R.W.'s] extreme poor judgment not only for her own emotional health regarding [her relationship with M.D.W.], but more so lack of addressing the severe needs present for the children, particularly in the absence initially of emotional/mental illness or more severe substance abuse, suggests a lack of benefit from mental health/substance treatment. While issues are now present to be treated, reunification with her children is questionable. The continued lack of normal maternal interest in their care (nutrition, medical, safety, etc.) strongly suggests attributes resistance to change.

Dr. Baker diagnosed R.W. with Depressive Disorder NOS and Cluster C–Dependent Personality Features. CPS has noted concerns that R.W. "is doing all that is requested in a short time period, and possibly not internalizing everything she is learning and working on. [She is] [p]ossibly just going through the motions and checking off things on her to do list." However, R.W. attended grief therapy after the death of L.W., and her therapist recommended reunification because R.W. has "better self-esteem and love for herself." There is no evidence in the record regarding whether the grief therapist was informed of the circumstances surrounding L.W.'s death.

On November 7, the State filed its petition for termination of parental rights concerning M.W. and Z.W. In the petition, the State pled that the parent–child relationship between R.W. and the children should be terminated pursuant to Iowa Code sections 232.116(1)(*d*), (*h*) and (*i*).[3] The petition also set forth specific facts and reasons in support of termination. Some of the facts the petition alleged in support of

---

[3]Iowa Code section 232.116(1) provides in relevant part:

[T]he court may order the termination of both the parental rights with respect to a child and the relationship between the parent and the child on any of the following grounds:

. . .

*d.* The court finds that both of the following have occurred:

(1) The court has previously adjudicated the child to be a child in need of assistant after finding the child to have been physically or sexually abused or neglected as the result of the acts or omissions of one or both parents, or the court has previously adjudicated a child who is a member of the same family to be a child in need of assistance after such a finding.

(2) Subsequent to the child in need of assistance adjudication, the parents were offered or received services to correct the circumstances which led to the adjudication, and the circumstance continues to exist despite the offer or receipt of services.

. . .

*h.* The court finds that all of the following have occurred:

(1) The child is three years of age or younger.

(2) The child has been adjudicated a child in need of assistance pursuant to section 232.96.

(3) The child has been removed from the physical custody of the child's parents for at least six months of the last twelve months, or for the last six consecutive months and any trial period at home has been less than thirty days.

(4) There is clear and convincing evidence that the child cannot be returned to the custody of the child's parents as provided in section 232.102 at the present time.

*i.* The court finds that all of the following have occurred:

(1) The child meets the definition of child in need of assistance based on a finding of physical or sexual abuse or neglect as a result of the acts or omissions of one or both parents.

(2) There is clear and convincing evidence that the abuse or neglect posed a significant risk to the life of the child or constituted imminent danger to the child.

(3) There is clear and convincing evidence that the offer or receipt of services would not correct the conditions which led to the abuse or neglect of the child within a reasonable period of time.

termination included the following: that both children were three years of age or younger; R.W.'s history of only supervised visitation; that R.W. struggled to parent all three children at once; that the children exhibited negative behavior following visitation; that R.W. made progress with substance abuse treatment but made limited progress with mental health treatment; the psychiatrist's statement that "continued lack of normal maternal interest in her children's care (nutrition, medical, safety, etc.) strongly suggests attributes resistant to change" and his conclusion that "reunification with her children is questionable"; and behavior indicative of the mother's persistent lack of judgment and co-dependence.[4]  Even with on-going services being provided to R.W., the State alleged that the conditions which led to the removal of the children and CINA adjudication could not be corrected within a reasonable period of time and that the children could not be returned to the mother's custody.

The hearing on the termination petition came before the juvenile court on May 8, 2015, and the court issued its order on July 7.  In that order, the court concluded that each of the statutory grounds advanced by the State in its petition for termination of parental rights as to M.W. and Z.W. was supported by clear and convincing evidence.  *See id.* § 232.117(3).  The juvenile court also concluded that M.W and Z.W. could not be returned to the care of their mother.  Finally, it concluded that it was in the best interest of each of the children to terminate the parent–child relationships so that they will have the opportunity to grow and mature in a safe, healthy, and stimulating environment.  In its

---

[4]R.W. had become pregnant very soon after the death of L.W.  D.W. was born in March 2015.  Additionally, T.W., the putative father of D.W., has a history of child abuse and exhibits controlling behavior with R.W.

order, judgment and decree, the juvenile court terminated the parental rights to M.W. and Z.W. pursuant to sections 232.116(1)(*d*) and (*i*). It also terminated the parental rights to M.W.—but not Z.W.—pursuant to section 232.116(1)(*h*). R.W. appealed, and we transferred the case to the court of appeals. The court of appeals affirmed the termination of parental rights to M.W., but reversed the termination of parental rights to Z.W. The State applied for further review, which we granted.

## II. **Standard of Review.**

In termination of parental rights cases, we review the proceedings de novo. *In re A.M.,* 843 N.W.2d 100, 110 (Iowa 2014). "We are not bound by the juvenile court's findings of fact, but we do give them weight, especially in assessing the credibility of witnesses." *Id.* (quoting *In re D.W.,* 791 N.W.2d 703, 706 (Iowa 2010)). There must be clear and convincing evidence of the grounds for termination of parental rights. *D.W.,* 791 N.W.2d at 706; *see* Iowa Code § 232.117(3). Evidence is considered clear and convincing "when there are no 'serious or substantial doubts as to the correctness [of] conclusions of law drawn from the evidence.' " *Id.* (quoting *In re C.B.,* 611 N.W.2d 489, 492 (Iowa 2000)).[5]

## III. **Analysis.**

Our review of termination of parental rights under Iowa Code chapter 232 is a three-step analysis. *D.W.,* 791 N.W.2d at 706. The first step is to determine whether any ground for termination under section 232.116(1) has been established. *Id.* If we find that a ground for termination has been established, then we determine whether the best-

---

[5]This oft-quoted language suffers from a malignant sixteen-year-old typo. By following the quotation all the way back to its inception, we note it is meant to read "the correctness *of* conclusions of law." *See Raim v. Stancel,* 339 N.W.2d 621, 624 (Iowa Ct. App. 1983).

interest framework as laid out in section 232.116(2) supports the termination of parental rights. *Id.* at 706–07. Finally, if we do find that the statutory best-interest framework supports the termination of parental rights, we consider whether any exceptions in section 232.116(3) apply to preclude termination of parental rights. *Id.* at 707.

**A. Error Preservation.** Here, we are confronted with a unique situation. The order, judgment, and decree from the juvenile court is internally inconsistent regarding the grounds relied on in terminating the parental rights to M.W. and Z.W. After an exhaustive review of the facts, the juvenile court notes that under Iowa law, the court may order termination of parental rights if there is clear and convincing evidence to support any of the grounds for termination as set forth in Iowa Code section 232.116. The juvenile court then concludes that "*each* of the statutory grounds advanced by the State in its Petition for Termination of Parental Rights as to [M.W.] and [Z.W.] is supported by clear and convincing evidence." (Emphasis added.) The State's petition for termination requested that R.W.'s rights to both M.W. and Z.W. be terminated under Iowa Code sections 232.116(1)(*d*), (*h*), and (*i*). However, in the order, judgment, and decree section of the termination order, the juvenile court ordered that the parental rights to M.W. be terminated under all three sections but the parental rights to Z.W. be terminated only under sections 232.116(1)(*d*) and (*i*). The juvenile court provides no explanation as to why it applied section 232.116(1)(*h*) only to M.W. and not to Z.W.

The court of appeals first analyzed whether the parental rights to the children could be properly terminated pursuant to Iowa Code sections 232.116(1)(*d*) and (*i*). Each of these code provisions require "physical abuse or neglect" or "abuse or neglect," which both the code

and this court have defined as meaning "any nonaccidental physical injury suffered by a child as the result of the acts or omissions of the child's parent, guardian, or custodian or other person legally responsible for the child." Iowa Code § 232.2(42); *In re J.S.*, 846 N.W.2d 36, 41 (Iowa 2014). The court of appeals concluded that the record contained no evidence that either of the children suffered a "nonaccidental physical injury" that would support the termination of parental rights pursuant to these code sections. We agree and affirm the court of appeals in this regard. We also affirm the court of appeals on R.W.'s other numerous contentions of claimed error by the juvenile court.

However, the court of appeals declined to consider the termination of parental rights to Z.W. under Iowa Code section 232.116(1)(*h*). Procedurally, the State did not file an Iowa Rule of Civil Procedure 1.904(2)[6] motion to modify the termination order, nor did it file a cross-appeal seeking appellate review of the termination order with regard to the distinction between M.W. and Z.W. under section 232.116(1)(*h*). The court of appeals cited to a previous case, *In re A.R.*, wherein the court of appeals held that it would not terminate parental rights on a ground not relied upon by the juvenile court when the State did not file either a rule 1.904(2) motion or a cross-appeal. 865 N.W.2d 619, 629–30, 633 (Iowa Ct. App. 2015). However, because our holding in this case in contrary to the court of appeals' conclusion, we overrule *In re A.R.* to the extent it held a rule 1.904(2) motion or cross-appeal was required for it to

---

[6]Iowa Rule of Civil Procedure 1.904(2) provides,

> On motion joined with or filed within the time allowed for a motion for new trial, the findings and conclusions may be enlarged or amended and the judgment or decree modified accordingly or a different judgment or decree substituted. But a party, on appeal, may challenge the sufficiency of the evidence to sustain any finding without having objected to it by such motion or otherwise.

consider alternate grounds for affirmance that were raised before the juvenile court.

Under our general rules of appellate review, "[w]e are obliged to affirm an appeal where any proper basis appears for a trial court's ruling, even though it is not one upon which the court based its holding." *State v. Maxwell*, 743 N.W.2d 185, 192 (Iowa 2008) (quoting *Citizens First Nat'l Bank v. Hoyt*, 297 N.W.2d 329, 332 (Iowa 1980)). Although this court has not yet had the opportunity to apply this general rule of appellate review to termination-of-parental-rights cases, the court of appeals has done so. *See, e.g.*, *In re T.N.M.*, 542 N.W.2d 574, 575 (Iowa Ct. App. 1995).[7] Nevertheless, "[o]ur cases are legion which hold that a trial court may be affirmed on grounds upon which it does not rely." *Johnston Equip. Corp. of Iowa v. Indus. Indem.*, 489 N.W.2d 13, 17 (Iowa 1992). It is when a party does not present an issue to the district court that we decline to decide the issue. *See City of Postville v. Upper Explorerland Reg'l Planning Comm'n*, 834 N.W.2d 1, 8 (Iowa 2013).

Further, the State was not required to file a cross-appeal for us to consider whether parental rights to Z.W. may be terminated under section 232.116(1)(*h*). "It is well-settled law that a prevailing party can raise an alternative ground for affirmance on appeal without filing a notice of cross-appeal, as long as the prevailing party raised the alternative ground in the district court." *Duck Creek Tire Serv., Inc. v. Goodyear Corners, L.C.*, 796 N.W.2d 886, 893 (Iowa 2011); *see also Moyer v. City of Des Moines*, 505 N.W.2d 191, 193 (Iowa 1993) ("A successful party, without appealing, may attempt to save a judgment on

---

[7]The court of appeals has also applied this principle in a number of unpublished termination of parental rights cases. *See, e.g.*, *In re J.B.*, No. 08–1557, 2009 WL 1140492, at *2 (Iowa Ct. App. March 11, 2009).

appeal based on grounds urged in the district court but not considered by that court."). We have previously noted that "a successful party need not cross-appeal to preserve error on a ground urged but ignored or rejected" in the trial court. *EnviroGas, L.P. v. Cedar Rapids/Linn Cty. Solid Waste Agency*, 641 N.W.2d 776, 781 (Iowa 2002) (quoting *Johnston Equip. Corp.*, 489 N.W.2d at 16). "This is because a party need not, in fact cannot, appeal from a favorable ruling." *Johnston Equip. Corp.*, 489 N.W.2d at 16. Therefore, we hold the prevailing party in a termination-of-parental-rights action need not file a cross-appeal or a rule 1.904(2) motion to assert an alternative ground for affirmance on appeal that was raised before the juvenile court.

In this case, the State was the prevailing party in the juvenile court because the court ultimately terminated parental rights to both M.W. and Z.W. The State also properly raised the grounds for termination under all three sections of Iowa Code section 232.116 as to both children before the juvenile court. Therefore, the State was not required to file a cross-appeal or a rule 1.904(2) motion in this case in order for the court of appeals or this court to consider whether the parental rights to Z.W. may be terminated under Iowa Code section 232.116(1)(*h*). The juvenile court concluded that "*each* of the statutory grounds . . . is supported by clear and convincing evidence" for both children. (Emphasis added.) We are therefore free to consider the ground for termination under 232.116(1)(*h*) equally for both children.

**B. Whether Termination is Appropriate.** The juvenile court concluded that there was clear and convincing evidence to support the termination of parental rights under three provisions of Iowa Code section 232.116. We have already addressed the inapplicability of two of these code provisions—sections 232.116(1)(*d*) and (*i*)—earlier in this

opinion. However, we still need to determine whether there is clear and convincing evidence to support the remaining ground for termination of the parental rights of R.W. to both M.W. and Z.W. under section 232.116(1)(*h*). *See In re A.B.*, 815 N.W.2d 764, 774 (Iowa 2012) ("When the juvenile court terminates parental rights on more than one statutory ground, we may affirm the juvenile court's order on any ground we find supported by the record.").

1. *Underlying basis for CINA adjudication.* On June 2, the juvenile court found that there was clear and convincing evidence that M.W. and Z.W. were CINA pursuant to Iowa Code sections 232.2(6)(*b*), .2(6)(*c*)(2), and .2(6)(*n*). Iowa Code section 232.2(6)(*b*) necessitates a finding that a child is a CINA when the "parent, guardian, other custodian, or other member of the household in which the child resides has physically abused or neglected the child, or is imminently likely to abuse or neglect the child." Iowa Code § 232.2(6)(*b*). Section 232.2(6)(*c*)(2) provides that a child should be adjudicated a CINA when they have suffered or are imminently likely to suffer harmful effects due to "[t]he failure of the child's parent, guardian, custodian, or other member of the household in which the child resides to exercise a reasonable degree of care in supervising the child." *Id.* § 232.2(6)(*c*)(2). Section 232.2(6)(*n*) requires the juvenile court to adjudicate a child as a CINA if their "parent's or guardian's mental capacity or condition, imprisonment, or drug or alcohol abuse results in the child not receiving adequate care." *Id.* § 232.2(6)(*n*). Pursuant to the Iowa Rules of Appellate Procedure, a notice of appeal from an order adjudicating a child CINA must be filed within fifteen days of the filing of the order or judgment. Iowa R. App. P. 6.101(1)(*a*). The order adjudicating M.W. and Z.W. as CINA was filed on June 2. R.W. did not timely appeal the order adjudicating the children

as CINA, and thus the juvenile court's adjudication order is conclusive. *See A.M.*, 843 N.W.2d at 111 (treating the second element as established after the child in question had been adjudicated CINA).

2. *Section 232.116(1)(h) analysis.* The juvenile court concluded that there were grounds for termination under Iowa Code section 232.116(1)(*h*). This code section provides that the juvenile court may terminate parental rights if it finds that all four of the following circumstances have occurred:

(1) The child is three years of age or younger.

(2) The child has been adjudicated a child in need of assistance pursuant to section 232.96.

(3) The child has been removed from the physical custody of the child's parents for at least six months of the last twelve months, or for the last six consecutive months and any trial period at home has been less than thirty days.

(4) There is clear and convincing evidence that the child cannot be returned to the custody of the child's parents as provided in section 232.102[8] at the present time.

Iowa Code § 232.116(1)(*h*). The juvenile court found there was clear and convincing evidence on each of the above elements to warrant termination for each of the children. The court of appeals agreed that each of the above elements had been met as to M.W., warranting termination. However, it failed to consider the same elements as to Z.W. and reversed termination as to Z.W. under the other two provisions of section 232.116.

Based on our de novo review of the record, we conclude there is clear and convincing evidence that each of the four requirements of Iowa

---

[8]Iowa Code section 232.102 provides rules for how the juvenile court may transfer the legal custody of children, in addition to how and where children may be placed. Iowa Code § 232.102.

Code section 232.116(1)(*h*) have been met for both M.W. and Z.W., and the grounds for termination were proven. At the time of the termination hearing, M.W. was two years old, born on April 13, 2013. Z.W. was three years old, born on March 28, 2012. Both children were adjudicated CINA in June 2014. No timely appeal was filed from the CINA adjudication, which establishes element two. *See A.M.*, 843 N.W.2d at 111 (treating the second element as established after the child in question had been adjudicated CINA). The children were removed from the physical custody of R.W. in April 2014. At the time of the termination hearing, the children had been out of the physical custody of R.W. for twelve consecutive months. The children have had no trial period at home with R.W.

Finally, there is clear and convincing evidence in the record that at the time of the termination hearing, the children could not be safely returned to the custody of R.W. In reaching this conclusion, we note that R.W. has never accepted responsibility for her actions in the death of L.W. or assumed any responsibility for the removal of M.W. and Z.W. from her home. Rather, she chooses to place the responsibility and blame on M.D.W. Although R.W. has undergone substance abuse treatment and mental health evaluations, she continues to exhibit the same co-dependent behavior that led to her negative relationship with M.D.W. Immediately after leaving the abusive relationship with M.D.W., R.W. began a relationship with T.W., who has a history of child abuse and who threatened R.W. for attempting to set boundaries. This behavior demonstrates that R.W. continues to make decisions without thinking of the impact on her children.

Although R.W. has presented a clean apartment for her scheduled CPS visits, she has refused entry to the apartment for unscheduled

visits, raising concerns about the normal cleanliness level of her home. Additionally, R.W. began working in April 2015. Although she did obtain employment, concerns remain about her ability to support herself and her children. Her employment began only one month before the termination hearing. More significantly, throughout the proceedings involving her children, R.W. provided little to no financial assistance for M.W., Z.W., or D.W. This delay in finding regular employment reflects her prior pattern of irresponsibility and lack of planning when it comes to her children.

The record reflects that R.W. was unable to adequately supervise all three children together during visitations and that M.W. and Z.W. exhibited destructive and worrisome behavior following visits. After supervised visitations, the children would bang their heads, scream, kick, have night terrors, bite, and sleepwalk. Further, although R.W. has requested increased visitation with her children, visits have never been able to progress to either semi-supervised or unsupervised due to the destructive behavior the children exhibited after their visits with R.W. The record supports the juvenile court's conclusion that there was "no evidence to suggest that [R.W.] would do any better at parenting three small children at [the time of the termination order], or at any time in the foreseeable future, on her own."

The juvenile court's conclusion that the children cannot be safely returned to the custody of R.W. is also supported by the statements provided by the mental health care professionals and CPS workers associated with the case. One of the mental health providers concluded that R.W.'s "continued lack of normal maternal interest in [her children's] care (nutrition, medical, safety, etc.) strongly suggests attributes resistant to change." He thought that the prospect of R.W. reuniting with

her children was "questionable." CPS workers have noted that while R.W. "is doing all that is requested in a short time period, [she is] possibly not internalizing everything she is working on. [She is] possibly just going through the motions and checking things off on her to do list."

Upon our de novo review, we conclude that there is clear and convincing evidence in the record that the children could not safely be returned to the custody of R.W. under Iowa Code section 232.102 at the time of the termination hearing. Therefore, we find there is clear and convincing evidence in the record that meets the requirements of Iowa Code 232.116(1)(*h*). The State has proven this ground supports the termination of parental rights to M.W. and Z.W.

**C. Best-Interest Analysis.** Once we have established that at least one ground for termination under 232.116(1) exists, the next step of our analysis is to evaluate whether the termination of parental rights would be in the best interest of the child under section 232.116(2). *D.W.*, 791 N.W.2d at 706–07. When we consider whether parental rights should be terminated, we "shall give primary consideration to the child's safety, to the best placement for furthering the long-term nurturing and growth of the child, and to the physical, mental, and emotional condition and needs of the child." Iowa Code § 232.116(2); *see also D.W.*, 791 N.W.2d at 708. In making this determination, we may consider a number of factors. *D.W.*, 791 N.W.2d at 708. We may consider "[w]hether the parent's ability to provide [for] the needs of the child is affected by the parent's mental capacity or mental condition or the parent's imprisonment for a felony." Iowa Code § 232.116(2)(*a*). If the children have been placed in foster care, we consider the extent to which they have become integrated into that family. *Id.* § 232.116(2)(*b*). For integration, we look at how long the children have been living with the

foster family, how continuity would affect the children, and the preference of the children if they are capable of expressing a preference. *Id.* § 232.116(2)(*b*)(1)–(2). Last, we may also consider statements of foster parents or relatives with whom the children have been placed. *Id.* § 232.116(2)(*c*). We also note that when we evaluate whether termination is in the child's best interest,

> [i]t is well-settled law that we cannot deprive a child of permanency after the State has proved a ground for termination under section 232.116(1) by hoping someday a parent will learn to be a parent and be able to provide a stable home for the child.

*A.M.,* 843 N.W.2d at 112 (quoting *In re P.L.,* 778 N.W.2d 33, 41 (Iowa 2010)).

Both M.W. and Z.W. have continued to reside with their maternal aunt and her spouse since February 2015. Both children have continued to meet proper developmental milestones. The juvenile court found that their aunt and her spouse are able to provide for their physical, emotional, and financial needs. The aunt and her spouse also currently have physical custody of their younger half-sibling, D.W. The children have adjusted well to the home. The juvenile court found that the children were well integrated into the home. *See* Iowa Code § 232.116(2)(*b*). Further, the aunt and her spouse have expressed the desire to adopt both M.W. and Z.W. if parental rights are terminated. *See id.* § 232.116(2)(*c*). Upon our de novo review, we conclude that the considerations in section 232.116(2) support the termination of parental rights of R.W. to both M.W. and Z.W.

**D. Exceptions.** Once we have established that the termination of parental rights is in the children's best interests, the last step of our analysis is to determine whether any exceptions in section 232.116(3)

apply to preclude the termination. *D.W.*, 791 N.W.2d at 707. There are five exceptions to a finding of termination:

      a. A relative has legal custody of the child.

      b. The child is over ten years of age and objects to the termination.

      c. There is clear and convincing evidence that the termination would be detrimental to the child at the time due to the closeness of the parent-child relationship.

      d. It is necessary to place the child in a hospital, facility, or institution for care and treatment and the continuation of the parent-child relationship is not preventing a permanent family placement for the child.

      e. The absence of a parent is due to the parent's admission or commitment to any institution, hospital, or health facility or due to active service in the state or federal armed forces.

Iowa Code § 232.116(3). While a finding of any of these factors allows us to choose not to terminate parental rights, "[t]he factors weighing against termination in section 232.116(3) are permissive, not mandatory." *A.M.*, 843 N.W.2d at 113 (quoting *In re D.S.*, 806 N.W. 2d 458, 474–75 (Iowa Ct. App. 2011)). We may use our discretion, "based on the unique circumstances of each case and the best interests of the child, whether to apply the factors in this section to save the parent–child relationship." *Id.* (quoting *D.S.*, 806 N.W. 2d at 475).

We first note that while there is certainly some bond between R.W. and her children, the two children have remained outside of her care since their original removal almost two years ago. The children are young—ages two and three. The children act out negatively following their visitation with R.W. For more than one year, R.W. has not progressed beyond more than limited, supervised visits with the children. Even some of these supervised visitations become overwhelming to R.W.

The children are adoptable, and their maternal aunt and her spouse have expressed the desire to adopt both M.W. and Z.W.  The children have achieved stability in their aunt's home and continue to meet developmental milestones.  On our de novo review, we decline to find an exception under section 232.116(3) renders termination improper.

### IV. Conclusion.

We conclude that there is clear and convincing evidence to support the termination of parental rights under Iowa Code section 232.116(1)(*h*) as to both M.W. and Z.W.  Additionally, termination of the parental rights of R.W. is in the best interests of the children.  Finally, we decline to apply any of the exceptions precluding termination.

**DECISION OF COURT OF APPEALS AFFIRMED IN PART AND REVERSED IN PART; JUVENILE COURT JUDGMENT AFFIRMED.**